

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-1999

# In Re: Resorts Intl

Precedential or Non-Precedential:

Docket 98-6037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: Resorts Intl" (1999). *1999 Decisions.* Paper 182.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/182

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6037

IN RE: RESORTS INTERNATIONAL, INC.,
RESORTS INTERNATIONAL FINANCING INC.,
GRIFFIN RESORTS INC., and
GRIFFIN RESORTS HOLD, INC.,
       Debtors

FRED LOWENSCHUSS, individually and as
Trustee of FRED LOWENSCHUSS, I.R.A.,
LAURANCE LOWENSCHUSS, I.R.A., and
FRED LOWENSCHUSS ASSOCIATES PENSION PLAN

v.

RESORTS INTERNATIONAL, INC.

       Sun International North America, Inc.,
       which was formerly known as
       Griffin Gaming & Entertainment, Inc.,
       which was formerly known as
       Resorts International, Inc.,

       Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. No. 97-cv-04710)
District Judge: The Honorable Nicholas H. Politan

ARGUED JANUARY 14, 1999

BEFORE: Nygaard, Alito, and Lewis, Circuit Judges.

(Filed June 30, 1999)

Mitchell A. Karlan, Esq. (Argued)
Gibson, Dunn & Crutcher
200 Park Avenue, 47th Floor
New York, NY 10166-0193
 Attorney for Appellant

Michael R. Griffinger, Esq. (Argued)
Gibbons, Del Deo, Dolan, Griffinger
 & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497
 Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge:

Resorts International, Inc., now Sun International North America, Inc., ("Resorts") appeals a District Court order reversing a Bankruptcy Court order that awarded Resorts full restitution for losses resulting from a stock transaction. The Bankruptcy Court found for Resorts on the alternative grounds of mistake and fraud. We will affirm the District Court's reversal.

I.

The relevant facts are generally undisputed and we need only summarize. Fred Lowenschuss was a shareholder of Resorts stock.[1] In 1988, Griffco Acquisition Corporation

_____

1. Fred Lowenschuss was the original defendant in this case. He held a total of 105,900 shares of Resorts stock both as an individual and as trustee for the Fred Lowenschuss IRA, the Laurance Lowenschuss IRA, and the Fred Lowenschuss Associates Pension Plan (the holder of most of the shares in question). Before the November 1996 trial, Fred's son, Laurance Lowenschuss, became the trustee of the Pension Plan, and the Bankruptcy Court severed the claims against Fred Lowenschuss individually and as a trustee. Laurance Lowenschuss, the current trustee of the Pension Plan and of the Laurance Lowenschuss IRA, is litigating this appeal. For simplicity, we will refer to Appellees simply as
"Lowenschuss."

2

(owned by Merv Griffin) purchased Resorts in a leveraged buyout for $36 per share. Resorts sent a proxy statement to all its shareholders that explained the terms of the merger and stated that the shareholders had the right to receive $36 per share or to seek appraisal rights in the Delaware courts.

Ultimately, the merger was approved by the Delaware Chancery Court and consummated. Resorts then sent a "Notice of Merger of Griffco Acquisition Corp. With and Into Resorts International Inc.," and a "Transmittal Letter" to shareholders, explaining that they could either tender their shares and receive $36 per share or obtain an appraisal under section 262 of the Delaware Corporation Law. Lowenschuss sent Resorts a letter demanding an appraisal.

He then filed an appraisal action in the Eastern District of Pennsylvania. One week later, Resorts petitioned for appraisal in Delaware Chancery Court, identifying Lowenschuss as a shareholder seeking appraisal. The federal District Court dismissed Lowenschuss's claim without prejudice, deferring to the proceedings in Delaware. See Lowenschuss v. Resorts Int'l, Inc., No. Civ.A.89–1071 (E.D. Pa. June 29, 1989).

The Delaware Chancery Court issued a "Notice of Entitlement to Appraisal," explaining that shareholders seeking appraisal must "deliver [their] stock . . . certificates to the Register in Chancery within sixty (60) days of this notice [or risk] dismissal of the appraisal proceedings as to [the] shares." In re Appraisal of Resorts International, Inc., No. Civ.A.10626 (Del. Ch. May 31, 1989). Lowenschuss never delivered his shares. Instead, he filed an amended complaint in the Eastern District of Pennsylvania against Resorts and others, moving for reconsideration of his request for an appraisal of the shares under his control. The District Court dismissed this action without prejudice, again because of the Delaware Chancery Court proceedings.

This dispute involves the next moves by Lowenschuss. First, he filed (again in the Eastern District of Pennsylvania) a "Petition Requiring Resorts . . . to Pay $36.00 Merger Price to Plaintiffs Immediately for 105,900 Shares of Resorts Class A Stock Owned by Plaintiffs and Which Are

3

Hereby Being Tendered and to Complete the Record." In the Petition, he stated: "Plaintiffs are hereby tendering all of their Resorts International, Inc. Class A shares totaling One hundred and Five thousand Nine hundred (105,900) shares for immediate payment of the merger price of Thirty-six Dollars ($36.00) per share plus the interest which plaintiffs may be entitled to."

Then, four days later, Lowenschuss tendered his shares, which were clearly marked as his, to Merrill Lynch, his broker, who in turn tendered them to Chase Manhattan Bank, Resort's Transfer Agent for the merger. As it regularly did, Chase forwarded a list of the tendering shareholders to Resorts and asked Resorts to wire funds to the payment account. Approximately two weeks after the tender, Resort's treasurer authorized the transfer of funds to Chase. Chase then delivered a check to Merrill Lynch for $3,805,200.00, which was paid over to Lowenschuss. Subsequently, the District Court denied Lowenschuss's Petition. See Lowenschuss v. Resorts Int'l, Inc., No. Civ.A.89-1071 (E.D. Pa. Aug. 3, 1989).

When Resorts realized that it had paid Lowenschuss the merger price, it filed this suit seeking to recover the payment. Following the initiation of Resort's Chapter 11 reorganization in New Jersey, this case was removed from the Eastern District of Pennsylvania to the Bankruptcy Court for the District of New Jersey. Resorts sought restitution of the transferred funds, claiming that the payment was (1) the result of a mistake by a Resorts employee, (2) a product of fraud, (3) contrary to Delaware corporate law, and (4) an avoidable transfer by a bankrupt entity under federal and New Jersey law. The Bankruptcy Court awarded Resorts full restitution on the alternative grounds of mistake and fraud, and appeared also to rely on the doctrine of illegal contracts and in pari delicto. See In re: Resorts International, Nos. 89-10119; 89-10120; 89-10461; 89-10462; Adv. No. 90-1005 (Bankr. D.N.J. Apr. 22, 1997) (slip opinion, hereinafter "Resorts I").

On appeal, the District Court reversed the Bankruptcy Court's ruling, concluding, inter alia, that there was no mistake of fact and that Resorts did not reasonably rely upon any misrepresentation. See In re: Resorts Int'l, Inc.,

4

No. Civ.A.97–4710 (D.N.J. Mar. 26, 1998) (unpublished letter opinion, hereinafter "Resorts II"). Resorts now appeals the District Court's decision, alleging that the court erred by overturning the Bankruptcy Court's holdings that: (1) Lowenschuss committed fraud; (2) Resorts made a mistake of fact; and (3) an illegal contract existed and the parties were not in pari delicto. Resorts also reasserts that the transaction is avoidable as a fraudulent conveyance under federal and state law. Finally, Lowenschuss contends that the Bankruptcy Court lacked jurisdiction.

We exercise plenary review over the decision of a district court sitting as an appellate court in a bankruptcy proceeding. See In re Swedeland Dev. Group, Inc ., 16 F.3d 552, 559 (3d Cir. 1994) (en banc). As a result, our review is essentially a direct review of the ruling of the Bankruptcy Court. See Allegheny Int'l Inc. v. Snyder (In re Allegheny Int'l Inc.), 954 F.2d 167, 172 (3d Cir. 1992). We review the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo. See In re Sharon Steel Corp., 871 F.2d 1217, 1222–23 (3d Cir. 1989).

II.

Resorts now asserts that it should have prevailed at trial on three common law theories -- fraud, mistake, and illegal contract.

A. Fraud

The Bankruptcy Court concluded that Lowenschuss defrauded Resorts of the payment for his shares. To establish a prima facie case for fraud under New Jersey law,[2] Resorts was required to prove: (1) that Lowenschuss made a material misrepresentation of a presently existing or past fact, (2) which he knew or believed to be false, (3) upon which he intended Resorts to rely, (4) and upon which Resorts reasonably did rely, (5) with resulting damages. See Jewish Ctr. v. Whale, 432 A.2d 521, 524 (N.J. 1981). Moreover, it had to prove each element by clear and convincing evidence. See Stochastic Decisions, Inc. v.

_____

2. The parties agree that New Jersey law governs this issue.

5

DiDomenico, 565 A.2d 1133, 1137 (N.J. Super Ct. App. Div. 1989).

We review the trial court's factual findings related to the fraud claim for clear error, keeping in mind the heightened "clear and convincing" standard. See, e.g. , United States v. Bertoli, 40 F.3d 1384, 1411 (3d Cir. 1994) (some "speculation [might] survive[ ] scrutiny under the preponderance of the evidence standard, [but] it certainly cannot withstand scrutiny under the clear and convincing evidence standard"); see also E.E.O.C. v. Local 638, 81 F.3d 1162, 1174 (2d Cir. 1996) (the clearly erroneous standard of review is more stringent when applied to a trial court's finding that had to meet the "clear and convincing" standard).

The District Court reversed the Bankruptcy Court, holding that it had misconstrued the significance of the various legal filings in question in finding a material misrepresentation, the facts did not support a finding of reliance, and, even if Resorts did rely on a misrepresentation, reliance was not reasonable. We agree because the evidence simply does not provide "clear and convincing" proof of reasonable reliance.[3]

A finding of reliance is subject to review for clear error, see, e.g., Hong Kong Deposit & Guar. Co. v. Shaheen, 111 B.R. 48, 52 (S.D.N.Y. 1990), and a trial court may infer reliance from the various facts and circumstances of a case. See Knop v. McMahan, 872 F.2d 1132, 1142 (3d Cir. 1989). Again, this element required proof by clear and convincing evidence.

The Bankruptcy Court considered the testimony of Resorts' former General Counsel, who stated that he understood at the time of Lowenschuss's tender that Lowenschuss had declined the merger price and was seeking a remedy in court. The General Counsel testified that it "[n]ever occurred to [him] that anyone would invoke

_____

3. Although we are not convinced that the District Court erred by holding that Lowenschuss's filings in this matter did not provide clear and convincing evidence of material misrepresentations, we need not resolve the issue because reasonable reliance was clearly lacking.

6

the appraisal rights and seek to be paid." Based solely upon this testimony, the Bankruptcy Court held that:"Resorts reliance was both reasonable and justifiable given the Trustee's numerous misrepresentations . . . that he was seeking a judicial remedy." Resorts I, at 49.

Although Lowenschuss may have sought judicial relief to receive the original merger price, this could not signify to Resorts that he would not also tender his shares to the company. Because Lowenschuss was seeking to be allowed to tender his shares for payment of the merger price, it was certainly plausible that he would attempt to perform any necessary acts on his part, including tendering his shares.

Courts often impose a stricter standard of reasonable reliance on sophisticated business persons. See Vanguard Telecomm., Inc. v. Southern New England Tel. Co., 900 F.2d 645, 655 (3d Cir. 1990). Even absent a stricter standard, however, Resorts' actions reveal no reliance whatsoever because they demonstrate that Resorts established a system that would blindly pay all shareholders, even those who had sought an appraisal. Thus, Lowenschuss could have tendered his shares and been paid even if he never filed either of the claims to which the Bankruptcy Court referred.

The District Court considered the Bankruptcy Court's finding that Resorts "failed to exercise reasonable care" when it authorized payment to Lowenschuss, Resorts II, at 19–22 (quoting Resorts I, at 33), to determine that any reliance by Resorts was not reasonable. In particular, the Bankruptcy Court found that

> Resorts failed to exercise reasonable care when it authorized payment to Lowenschuss . . . . Resorts breached its duty to adequately supervise the surrender of shares . . . by failing to make even a cursory investigation as to the identity of the tendering shareholder and whether that shareholder had previously sought appraisal rights.

> The record further demonstrates that Chase identified the [Lowenschuss] Pension Plan and I.R.A. as tendering shareholders in a transfer journal sheet dated July 26, 1989, some five days before the date

7

Resorts authorized payment for the shares. Resorts failed to provide a list of appraisal shareholders to the employees responsible for payment upon surrender of the shares, nor did Resorts provide such a list to Chase. Even after learning of the illegal payment to Lowenschuss, Resorts failed to issue corrected instructions to Chase to cease all payments to appraisal shareholders who failed to obtain the requisite approvals . . . . Resorts paid other appraisal shareholders, even after Resorts' counsel notified Lowenschuss of his intent to recover the funds paid to Lowenschuss.

Resorts I, at 33-34.

Knowing that Lowenschuss was seeking to be paid the merger price, Resorts should have, at the very least, reviewed the lists of tendering shareholders or contacted the court to determine whether it had custody of the shares. Nevertheless, Resorts did nothing. As a result, there simply was no reliance, reasonable or otherwise, by Resorts. The fraud claim, therefore, was properly rejected by the District Court.4

B. Mistake

Resorts next asserts that the District Court erred by reversing the Bankruptcy Court's ruling that Resorts made a mistake of fact. The Bankruptcy Court discussed Resorts' assertions that it was mistaken as to both fact and law; the former from its failure to recognize that it was Lowenschuss tendering the shares, and the latter from its belief that it was legally bound to pay Lowenschuss when he tendered. See Resorts I, at 25-28. Although the court then apparently concluded that Resorts had made a mistake of fact, its discussion of the issue relates to the alleged legal mistake. The Bankruptcy Court stated:

Here the Court finds that Resorts made a mistake of fact. Resorts' employees including its former treasurer, Thomas O'Donnell, and its Chief Financial Officer, Matthew B. Kearney mistakenly believed that Resorts

_____

4. Because we hold that there was not sufficient evidence of reasonable reliance, we need not address the remaining elements of the fraud claim.

8

was obligated to pay $36.00 for all Resorts shares tendered.

Id. at 28. Later, the Bankruptcy Court appeared to grant Resorts relief for its mistake: "[Lowenschuss] committed several wrongs apart from the illegality of the transaction. Accordingly, as this Court finds that Resorts made the payment as the result of a mistake, Resorts is entitled to restitution." Id. at 43. The court's analysis of this claim, however, included a discussion of the doctrine of illegal contract and in pari delicto. See Part II.C, infra.

The District Court noted, and Resorts concedes, that if Resorts made the payment under the misapprehension that it was legally required to, Resorts made a classic mistake of law. Not surprisingly, Resorts now reasserts that it made both a mistake of law and a mistake of fact and that it should prevail under either theory.

1. Mistake of Law

Notwithstanding the Bankruptcy Court's finding, Resorts' first assertion on appeal is that it made a unilateral mistake of law "based on the erroneous belief that the company was required to accept the tender of shares that were subject to an appraisal proceeding." Appellants' Br. at 38. However, it is a

settled principle of [New Jersey] law that where an individual under a mistake of law, but with full knowledge of the facts, voluntarily pays money on a demand not legally enforceable against him, he cannot recover it in the absence of unjust enrichment, fraud, duress or improper conduct on the part of the payee.

Messner v. County of Union, 167 A.2d 897, 898 (N.J. 1961). Resorts contends that it may recover under this theory because the Bankruptcy Court found sufficient "improper conduct" on Lowenschuss's part to allow for recovery.

We reject this contention because Resorts' action did not result from ignorance or a mistake of law. Resorts' full knowledge of the law is evidenced by its response to Lowenschuss's Petition. In the response, filed over a week before Resorts authorized the payment for Lowenschuss's shares, the company argued that the request for payment

was "contrary to the controlling Delaware statute." Far from being mistaken as to any relevant law, Resorts was simply careless in entering into this contract by paying Lowenschuss for his shares when it may not have been obligated to.

## 2. Mistake of fact

For similar reasons, Resorts cannot recover by contending that it was operating under a mistake of fact as to the identity of the tenderer (Lowenschuss). Wefirst note that a "unilateral mistake of a fact unknown to the other party is not ordinarily grounds for avoidance of a contract," and that, in order to grant rescission in the case of a factual mistake, "the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake." Intertech v. City of Paterson, 604 A.2d 628, 632 (N.J. Super. Ct. App. Div. 1992).

The Bankruptcy Court and District Court both found that Resorts failed to act with reasonable care. We agree. Resorts' ignorance was self-imposed. It could easily have determined that Lowenschuss was tendering the shares because a list of tendering shareholders with his name on it was forwarded to Resorts before it authorized the payments. Nevertheless, the company chose not to review the list. As a result, Resorts' failure to realize that Lowenschuss had tendered his shares was of its own doing, and it cannot recover under this theory.

## C. Illegal contract

As noted, the Bankruptcy Court interwove its discussion of mistake with a discussion of illegal contract and the doctrine of in pari delicto. In addition to the mistake analysis, the court appeared to find for Resorts under the illegal contract doctrine, holding that it deserved restitution because it was not in pari delicto with Lowenschuss.

The doctrine of in pari delicto normally applies as a common law defense against a party seeking to enforce an illegal contract. "In pari delicto potior est conditio defendentis" means that "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." Black's Law Dictionary 791 (6th ed. 1990).

10

Here, Resorts seeks to use the doctrine to gain restitution for its payment to Lowenschuss.

Resorts' argument runs counter to New Jersey's law, that courts will leave the parties to an executed illegal contract as they are. See, e.g., Marx v. Jaffe, 222 A.2d 519, 521 (N.J. Sup. Ct. App. Div. 1966); Paley v. Barton Sav. & Loan Ass'n, 196 A.2d 682, 685 (N.J. Super. Ct. App. Div. 1964). Courts on occasion, however, apply an equitable exception to this general rule when the parties are not in pari delicto. See, e.g., Singleton v. Foreman, 435 F.2d 962, 969 (5th Cir. 1970) (recognizing such an exception in Florida law). New Jersey courts give "a traditional construction to the defense," McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 757 (3d Cir. 1990) (citing Pendleton v. Gondolf, 96 A. 47 (N.J. Ch. Ct. 1915)), and have found a party to an illegal agreement deserving of equitable relief because he was not in pari delicto with the other party to the agreement. See Appel v. Reiner, 195 A.2d 310, 317-18 (N.J. Super Ct. Ch. Div. 1963), rev'd on other grounds, 204 A.2d 146 (N.J. 1964). The Bankruptcy Court treated the doctrine as part of New Jersey law and applied it here.

In its pre-trial ruling on the cross-motions for summary judgment, the Bankruptcy Court held that the transaction by which Lowenschuss tendered his shares and Resorts paid him for them constituted an illegal contract because the tender of the shares was contrary to Delaware Corporation Law S 262.5 The court held open the possibility

_____

5. Section 262 sets forth the rights and obligations of shareholders seeking an appraisal in lieu of payment for their shares following a merger. Lowenschuss voted against the merger and timely requested an appraisal, thereby securing the right to an appraisal. See Del. Code Ann. tit. 8, S 262(d). Subsection (e) allows the withdrawal of an appraisal demand and acceptance of the merger terms "at any time within 60 days after the effective date of the merger." Id., S 262(e). Lowenschuss, however, did not withdraw his request for appraisal within 60 days of the merger.

The statute also provides for withdrawals that occur more than sixty days after the merger:

    (k) From and after the effective date of the merger or consolidation,
        no stockholder who has demanded his appraisal rights as provided

11

that it might later find that the parties were not in pari delicto, and award Resorts the equitable remedy of restitution on this basis.

Following trial, the court found that Lowenschuss's misrepresentations, apart from the illegal transaction, prevented him from being in pari delicto with Resorts and ordered restitution in the amount of the transaction on this basis. See Resorts I, at 37–43. If the relative guilt of the parties is a primarily factual determination, then a trial court's finding of such is reviewed for clear error. See Rothberg v. Rosenbloom, 808 F.2d 252, 260 (3d Cir. 1986) (Seitz, J., concurring).

The Bankruptcy Court, however, was construing Lowenschuss's legal maneuvers to conclude that Lowenschuss was not in pari delicto with Resorts. The court noted: (1) that Lowenschuss tendered the shares knowing that they were subject to the appraisal action in Delaware; and (2) that after he tendered his shares, Lowenschuss

_____

in subsection (d) of this section shall be entitled to vote such stock
for any purpose or to receive payment of dividends or other
distributions on the stock . . . ; provided, however, that . . . if such
stockholder shall deliver to the surviving or resulting corporation a
written withdrawal of his demand for an appraisal and an
acceptance of the merger or consolidation, either within 60 days
after the effective date of the merger . . . as provided in subsection
(e) of this section or thereafter with the written approval of the
corporation, then the right of such stockholder to an appraisal shall
cease. Notwithstanding the foregoing, no appraisal proceeding in the
Court of Chancery shall be dismissed as to any stockholder without
the approval of the Court, and such approval may be conditioned
upon such terms as the Court deems just.

Id., S 262(e), (k) (emphasis added). Thus, section 262 requires a shareholder who has sought appraisal to get the corporation's written approval and the court's approval in order to withdraw his demand for appraisal more than 60 days after the date of the merger. The merger closed on November 15, 1988, and Lowenschuss did not tender his shares until July 17, 1989. Lowenschuss did not obtain Resorts' written approval of his withdrawal demand before tendering his shares. Therefore, his tender was contrary to the statute and, at least arguably, created an illegal contract.

failed to notify Resorts or the Pennsylvania District Court of the tender. See Resorts I, at 40-41. Although Lowenschuss may well have known that his tender was questionable, we agree with the District Court's conclusion that he was not more responsible for the mistaken payment than Resorts.

Resorts' Notice of Merger and Letter of Transmittal indicated that it would pay the merger price to shareholders who had previously requested appraisal. Although the Bankruptcy Court did not credit Lowenschuss's testimony that he relied on the Letter of Transmittal in tendering his shares, see Resorts I, at 37, the notice indicates that Resorts, like Lowenschuss, was acting inconsistently with section 262. In sum, Lowenschuss and Resorts were both to blame for the resulting transaction and were in pari delicto. The District Court correctly rejected this doctrine as a basis for recovery.

III.

Resorts next asserts that the transaction is avoidable as a fraudulent conveyance under 11 U.S.C. S 548(a)(1)(B).6

A. Section 548(a)(1)(B) avoidable transfers

Section 548(a)(1)(B) allows bankruptcy debtors to avoid some transactions completed before the bankruptcyfiling. It states:

> The trustee may avoid any transfer of an interest of the debtor in property . . . that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily. . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . was insolvent on the date that such transfer was made.

_____

6. The briefs refer to 11 U.S.C. S 548(a)(2); however, under the current code, the relevant section is 548(a)(1)(B). Section 548 was amended in 1998, and subsection 548(a)(2) now refers to transfers of charitable contributions.

Resorts also asserted a similar claim under N.J. Stat. Ann. SS 25:2-25(b)(1) and 25:2-27(a). It now states, and we accept, that the analysis of the federal and state laws is practically identical, and therefore separate analysis of the state claim is not necessary.

13

11 U.S.C. S 548(a)(1)(B). It is not disputed that the transaction took place less than a year before Resorts' bankruptcy filing. Thus, if Resorts received less than a reasonably equivalent value to the $3,800,000 it paid and was insolvent on the date of the transfer to Lowenschuss, then section 548 would allow the trustee to avoid the transfer.7

B. The section 546(e) exception

Section 546(e) provides an exception to the rule of section 548(a)(1)(B), preventing its operation when the payment in question was a securities "settlement payment." Section 546(e) states:

> Notwithstanding section[ ] . . . 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case . . . .

Id. S 546(e).8

The issue is whether the Bankruptcy Court erred by holding that Resorts' payment to Lowenschuss was a "settlement payment," and that section 546, therefore, barred the application of section 548(a)(1)(B). Section 741 defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim

_____

7. The Bankruptcy Court recited evidence that Resorts was insolvent when it paid Lowenschuss (including the fact that prior to making the payment, Lowenschuss had encouraged a group of Resorts shareholders to put the company into bankruptcy). See Resorts I, at 18-22. The court did not, however, make factual findings on this issue or the issue of reasonably equivalent value. Instead, the court assumed the existence of these elements and applied section 546(e) of the code. Because we determine that section 546(e) controls the outcome here, we need not address these factors.

8. The exception does not apply to transfers that are avoidable under section 548(a)(1)(A), which requires, inter alia, a showing that a transfer
was made with the intent to defraud creditors. That is clearly not the case here.

14

settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." Id. S 741(8) (emphasis added). Section 101 provides a similar definition, but limits it to payments used in the forward contracts trade. See id. S 101(51A).

In Bevill, Bresler & Shulman Asset Management Corp. v. Spencer Savings & Loan Ass'n, 878 F.2d 742 (3d Cir. 1989), we addressed the meaning of "settlement payment" under section 546(f) in a securities transfer under "repo" agreements. Section 546(f) is similar to section 546(e) except that it applies specifically to settlement payments made "by or to a repo participant in connection with a repurchase agreement." 11 U.S.C. S 546(f). In Bevill, we noted that section 546 is at the intersection of "two important national legislative policies . . . on a collision course" -- the policies of bankruptcy and securities law. 878 F.2d at 751. We stated that the "extremely broad," id., statutory definition of "settlement payment" is consistent with Congress's intent:

> that a "settlement payment" may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and that it includes transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand.

Id. at 752. Our prior recognition that the definition is extremely broad indicates that it is likely to encompass the instant transaction. Bevill, however, did not consider payments made pursuant to a leveraged buyout ("LBO"), and therefore does not definitively determine the outcome here.

We begin every statutory interpretation by looking to the plain language of the statute. See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998). When the language is clear, no further inquiry is necessary unless applying the plain language leads to an absurd result. See id.

15

In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. See Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir. 1990) (citing various securities industry texts). Here, the securities passed from Lowenschuss's broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded them to Merrill Lynch who paid Lowenschuss. Although no clearing agency was involved in this transfer, two financial institutions -- Merrill Lynch and Chase -- were. Under a literal reading of section 546, therefore, this was a settlement payment "made by . . . a financial institution." 11 U.S.C. S 546(e).

A number of district courts have held that the term "settlement payment" does not include payments made for shares by a corporation as part of an LBO. See, e.g., Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 675 (D.R.I. 1998); Wiebolt Stores, Inc. v. Schottenstein, 131 B.R. 655, 664-65 (N.D. Ill. 1991). The reasoning of these courts is essentially that "the system of intermediaries and guarantees" that normal securities transactions involve is not in play in an LBO. See Zahn, 218 B.R. at 676.

The only other court of appeals to directly address this question, however, followed a Bevill analysis and held that payments to shareholders as part of an LBO were "settlement payments" under the statute. See Kaiser Steel Corp. v. Pearl Brewing Co., 952 F.2d 1230, 1239-40 (10th Cir. 1991);[9] see also In re Comark, 971 F.2d 322, 325 (9th Cir. 1992) (citing Kaiser approvingly for the proposition that "a settlement is `the completion of a securities transaction' "). The general thrust of Kaiser Steel, Bevill and In re Comark is that the term "settlement payment" is a broad one that includes almost all securities transactions. Including payments made during LBOs within the scope of the definition is consistent with the broad meaning these

_____

9. Resorts argues that Kaiser Steel is inapposite because the transactions therein involved a clearing agency; however, some of the transactions also were made through a financial institution. See Kaiser Steel, 952 F.2d at 1240.

16

cases discern. A payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of section 546(e).10

Resorts alternatively encourages us to follow Munford v. Valuation Research Corp., 98 F.3d 604, 610 (11th Cir. 1996), in which the Eleventh Circuit Court of Appeals considered the application of section 546 to similar payments made to shareholders in an LBO. The two judges in the majority found it unnecessary to determine whether the payments were settlement payments under section 546, holding that even if they were,

> section 546(e) is not applicable unless the transfer (or settlement payment) was "made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency." 11 U.S.C. S 546(e). . . .
>
>  True, a section 546(e) financial institution was presumptively involved in this transaction. But the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares.

Munford, 98 F.3d at 610 (emphasis added).

The court went on to hold that trustees may only avoid transfers to a "transferee," and that the bank was not such a transferee because it never acquired a beneficial interest in the funds. See id. (citing In re Chase & Sanborn Corp., 848 F.2d 1196, 1200 (11th Cir. 1988)). It concluded that "the shareholders were the only `transferees' of the funds [and that] section 546(e) offers no protection from the trustee's avoiding powers to shareholders; rather, section

_____

10. Despite this logical conclusion, a number of commentators have criticized Kaiser Steel for applying section 546 to a transaction that did not implicate the concerns that Congress had in creating the law. See, e.g., Frank R. Kennedy & Gerald K. Smith, Fraudulent Transfers and Obligations: Issues of Current Interest, 43 S.C. L. Rev. 709 (1992).

546(e) protects only commodity brokers, forward contract merchants, stockbrokers, financial institutions, and securities clearing agencies." Id. The court therefore held section 546(e) inapplicable because the transaction did not involve a transfer to "one of the listed protected entities." Id.

We, however, are more persuaded by the dissent which relied, as we do, on the plain language of the statute. See id. at 613 (Hatchett, C.J., concurring in part and dissenting in part). Section 546(e) protects from trustee's avoidance powers settlement payments made "by . . . a financial institution." The majority in Munford seems to have read into section 546(e) the requirement that the "commodity brokers, forward contract merchants, stockbrokers, financial institutions, and securities clearing agencies" obtain a "beneficial interest" in the funds they handle for the section to be applicable. This requirement is not explicit in section 546.11

Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no absurd result from the application of the statute's plain language and will not disregard it. We hold, therefore, that section 546 applies to the transaction and prevents its avoidance under section 548(a)(1)(B).12

IV.

We conclude that Resorts does not deserve restitution under the state law claims; that Resorts may not avoid the transfer of funds to Lowenschuss by way of the bankruptcy statute; and that jurisdiction was proper in the Bankruptcy Court. We will affirm.

_____

11. Nor does it logically follow from the application of section 550, which allows trustees to recover property that was the subject of an avoided transfer from the transferee, see 11 U.S.C.S 550, as the Munford majority seemed to indicate. See Munford, 98 F.3d at 610.

12. Lowenschuss contends that the Pension Plan was improperly added as a party and that the Bankruptcy Court lacked jurisdiction because the removal to the Bankruptcy Court from the District Court for the Eastern District of Pennsylvania was invalid. We decline to discuss these claims, noting instead that they are without merit.

18

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit